MABELLE R. LANG

*vs.*

LURA A. CHASE, ESTELLE C. CHASE AND MINNIE R. BRYER; AND
ELIAS SMITH AND HENRY CLEAVES SULLIVAN, ADMINISTRATORS OF
THE ESTATE OF JOHN H. CHASE, LATE OF WATERBORO, DECEASED.

York.      Opinion June 11, 1931.

*Willard & Willard*, for plaintiff.
*Elias Smith,*
*Henry Cleaves Sullivan,*
*E. P. Spinney,* for defendants.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-
TON, THAXTER, JJ.

FARRINGTON, J.   On report. Bill in equity in which the plaintiff
alleges in substance, that the said John H. Chase on or about
September 1, 1926, entered into an oral agreement with her by
which he promised and agreed that, if she would remain with him
as long as he needed her, and assist him about his housework, and
in his home in nursing and caring for him, and in and about his
business and store, he would give her one-half of all the property
he had, real and personal; and that she, the said plaintiff, acting in
reliance on said promise and agreement, left her home in Michigan
and took up her residence with said Chase and remained with him
from the said first day of September, 1926, until the date of Chase's
death, and that during all that time she fully carried out and per-
formed all the duties and obligations on her part to be performed
and without payment to her of wage or compensation.

The bill asks (1) for a decree that Lura A. Chase, Estelle C.
Chase and Minnie R. Bryer, defendants, be declared "trustees for
the plaintiff of one half of the said hereinbefore described real es-
tate, and as holding one half of said real property in trust for said
plaintiff;" and (2) that they be ordered to convey one half of the
said real estate to the plaintiff "without any other or further pay-
ment by the plaintiff;" (3) that the said Elias Smith and Henry
Cleaves Sullivan be adjudged trustees for the plaintiff "of one half
of all of the hereinbefore described goods and chattels, rights and
credits, and other personal property, and as holding said one half

of the said personal property in trust for the plaintiff;" and (4) that the said Smith and Sullivan, as administrators, be ordered to give to the plaintiff a "good and sufficient" bill of sale, "conveying full title, free from all incumbrances," of the said one half of all said personal property; (5) that "the plaintiff may have such other and further relief as the nature of the case may require;" (6) that the plaintiff may have reasonable costs.

John H. Chase died intestate at Waterboro, Maine, August 11, 1929, leaving as his only heirs at law and next of kin three nieces, Lura A. Chase, Estelle C. Chase and Minnie R. Bryer, defendants in this case. On petition of the three nieces Elias Smith of Limerick, Maine, and Henry Cleaves Sullivan of Portland, Maine, both of whom are also named as defendants, were appointed and qualified as administrators of the estate. The inventory which was filed discloses real estate, $34,500.00, goods and chattels, $1,041.34, and rights and credits, $8,086.05, a total appraised valuation of $43,632.40.

The plaintiff, Mabelle R. Lang, was a daughter, by a former marriage, of Josephine Chase, deceased wife of John H. Chase. The record definitely discloses neither her age at the time of her mother's marriage to Chase nor the date of the marriage but it does disclose the fact that she was a member of Chase's family at least until she went away to school in Limerick and Portland. Later plaintiff married and came back at times to Chase's and her mother's home and still later, after her own marriage, with her own daughter, Josephine, about ten years of age, she came to the Chase home and cared for her mother during her last illness in 1912. It is clear that with her daughter, Josephine, the plaintiff remained with Chase some time after her mother's death, and it is also clear from letters and other evidence in the case that even after this time the plaintiff came to the Chase home more or less during the summer vacations. In letters to the plaintiff and her daughter Chase addressed them as "Dear children" and signed as "Grandpa," and letters to the plaintiff he signed "Dad," and in letters written to him by the plaintiff she addressed him as "My dear daddy" or "Dear daddy." It is also clear, giving due weight to all evidence in the case introduced by the defendants for the purpose of casting doubt on the situation, that Chase had always been interested in the plaintiff's

welfare and that of her daughter, Josephine, who graduated at Ann Arbor, Michigan, in which state the plaintiff was living with her daughter at the time she came on to see Chase in the summer of 1926, when the agreement, which is the basis of plaintiff's claim, is alleged to have been made.

At this time Chase was living in rooms over a store owned and operated by him, together with the local Post Office, and here the plaintiff came and made her home with him and remained until his death on August 11, 1929. The testimony of Chase's family physician for a period of twenty-five years shows Chase's physical condition was not good; that he had Bright's disease in a mild form; that he was troubled with hemorrhoids, constipation and indigestion, and that he had difficulty about walking, his death following a fall as he was coming downstairs.

Mabelle E. Chase, whose father was a cousin of John H. Chase, testified that she came to Maine from Florida in 1926, stating, "I think it was about the first of April." She said that she saw Chase a short time before the plaintiff came to his home later in 1926; that before plaintiff came Chase told her that he had sent for the plaintiff, and that after this, in August, 1926, she found him and plaintiff there together; that in May, 1929, in the store, he said to her, "Well, Mabelle will never be sorry if she stays and sees me through. I have talked with her and have agreed to give her half of everything I have." She testified that Chase said, "Mabelle is awfully good. She does the best she can. I couldn't get along without her." She also stated that a Mrs. Woodward and Ernest W. Stowers, who worked for Chase, were in the store when Chase made this statement and that the plaintiff was at the time attending to the mail at the Post Office.

Mrs. Woodward, who took Mabelle E. Chase to see Chase on the above occasion, testified she had never before seen the plaintiff nor Chase and that she was sitting within four feet of him and heard him say, "Mabelle has been awfully good to me and if she sees me through I am going to leave her half of what I have."

Ernest W. Stowers, who worked for Chase from August 17, 1928, until his death, August 11, 1929, testified that he heard him say to plaintiff, "When you came here to take care of me I agreed to give you half of everything I had and I will go 50-50 with you,"

and the plaintiff said, "If you are going to do that, I think you ought to attend to it."; that Chase said, "I will. I am going to have Elias down and make out the papers." Mr. Stowers testified that he was in the store the day Mrs. Woodward was there and that he could hear part of the conversation. The plaintiff's attorney asked him if he heard the statement made by Chase with reference to his giving Mabelle half of his property and the opposing attorney interrupted to make objection and Stowers did not answer. Plaintiff's attorney, instead of repeating the question, then asked him if he had heard Chase make similar statements to any other person and Stowers then said that he had heard him say to one Frank A. Chadbourne, "I am going to give half to Mabelle when I get through.", and that a good many times he had heard him say that he would provide for her and see that she was well taken care of.

John E. Lewis, who had charge of Chase's cottages at Camp Ellis, testified that in the first part of the summer of 1926 Chase said to him, "I have sent for Mabelle to come and take care of me. I am not going to stay alone.", and that shortly after that Chase brought the plaintiff to Camp Ellis.

Mrs. Annie B. Johnson stated that she heard Chase say he was going to "look after. Mabelle, and that he didn't know what he would do without her."; that he "couldn't get along without her."

The deposition of Mildred B. Johnston, taken pursuant to order of the Supreme Judicial Court, is properly before us and admissible as newly discovered evidence which the plaintiff could not with due diligence have previously discovered. In that deposition Mildred B. Johnston stated that she was and had been since 1919 cashier in the Bank at Limerick, Maine, and that the last of October or first of November, 1926, plaintiff came to the bank with Chase and that witness talked with both of them; that she took to Chase in the Directors' room some securities for which he had asked; that later she went back and she testified that at that time "Mr. Chase was talking about his health and better condition, and I asked him if Mabelle was going to stay with him, and he says, 'Yes, I have persuaded her to stay; she wanted to go back to Michigan, but I have persuaded her to stay; I told her I would give her half I have got if she would stay with me,' and he said 'That ought to be enough hadn't it?', and you know how he would chuckle over things, and I.

told him I thought it would." She testified that the plaintiff was not there and that the time "was after the 27th of October, and prior to the third of November — or the fifth of November, I should say."; that Chase said, "I am much better, but I can't think of staying alone."

By this competent and clearly admissible evidence disclosed by the record, evidence which we regard as full and clear, we are satisfied and convinced that at some time around August 1, 1926, an oral agreement was entered into between John H. Chase and the plaintiff, the substance of which was that the plaintiff was to remain with and care for Chase as long as he lived and that, if she performed her part of the agreement, Chase was to give her one-half of all the property which he had.

The defendants present little or no evidence of real probative value to dispute the plaintiff's contention that such a contract was made. One of the defendants' witnesses on being asked if Mrs. Bryer, herself a defendant, had not told witness that Chase had talked with her about plaintiff staying there and taking care of him and had said plaintiff was to have half of the property, answered, "I don't recall, but I wouldn't say it wasn't said." Another witness for defendants, in reply to the question, "John appeared to think a good deal of Mabelle, didn't he?", said "He did. Yes, a good deal of her. He told me with his own mouth that he should see that Mabelle was taken care of."

Several of the defendants' witnesses testify that after Chase's death the plaintiff made statements to the effect that there was nothing there for her, "nothing for her to stay for," and that she wanted to go back to her daughter in Michigan. There was also evidence from two or more witnesses for the defendants that the plaintiff made conversation about the possible value of her services during the time she had been with Chase. All this was clearly designed to cast doubt upon the existence of any contract and also upon the plaintiff's recognition of one. We are not impressed by it, as such remarks by the plaintiff might equally well be attributed to her ignorance of her legal rights under all the circumstances of the case. Mr. Chase had died without making a will to carry out the provisions of the contract and that fact was uppermost in her mind. There is nothing to indicate that she had consulted any attorney

in her own behalf and she may well have felt, in her ignorance of law, that the failure to make a new will, and the fact that an old will under which it is in evidence that she was to receive $2,000.00 could not be found, was the end of it all. The plaintiff, under the rule of exclusion, did not testify as to anything occurring prior to Chase's death. Just why she did not take the stand to give her own testimony as to events occurring after the death of Chase does not appear of record, but we regard the making of the contract as established by evidence too clear, full and convincing to be seriously affected by such statements, assuming that she did in fact make them.

After giving due consideration to all the admissible direct evidence presented by the plaintiff and by the defendants, and to all inferences which may be properly drawn therefrom, we are fully satisfied that the plaintiff fully, faithfully and completely performed her part of the agreement, thereby removing it from the operation of the Statute of Frauds. The relationship between the plaintiff and Chase was closer than that of a friend; it was virtually that of a father and daughter, and what the plaintiff did in that relationship and what she did for him in the store and the Post Office altogether constituted services which were in our opinion beyond those of a mere employee or housekeeper, services which could not ordinarily be expected of any servant and for which adequate compensation could not be provided by wages as such. It seems clear from the record that no compensation was paid to the plaintiff, although it is in evidence that Chase conveyed to her a half interest in the Welch place, so called, which was owned jointly by him and his wife during her lifetime, reserving a life interest therein. It also appears that he purchased for her an automobile which was used for his comfort and enjoyment as well as for hers. There is nothing in the case to indicate that either of these transactions was in the nature of payment for services or that either was anything but a gift to the plaintiff.

Contracts like the one involved in the instant case should not be sustained unless they are proved by full, clear and convincing evidence. *Brickley* v. *Leonard*, infra. Such contracts may divert from natural channels large portions of estates. We recognize the tendency of those who have rendered services for one since deceased to

magnify their value and if contracts of this character are accorded too much favor it may open the door for unscrupulous claimants to prosecute claims based on unsatisfactory, or even perjured, testimony, to the great prejudice of and danger to the rights of heirs and legatees. Such contracts should always be regarded as containing the elements of danger and should be subjected to the very closest scrutiny.

In this case we are, however, convinced that the contract has been satisfactorily established by the degree of evidence laid down above, and we are further satisfied that the plaintiff has fully and completely performed her part under the agreement so as to take it from the Statute of Frauds, and that she could not be adequately compensated in law, and that there are no circumstances or conditions rendering the claim inequitable.

"Such an agreement, where, in reliance upon it, the promisee has changed his condition and relation so that a refusal to complete would be a fraud upon him, and where the courts of law afford no adequate remedy, may be enforced in equity, if not within the statute of frauds, or if oral and by part or full performance removed from its operation, if there is present no inadequacy of consideration and there are no circumstances or conditions rendering the claim inequitable. In such cases the court does not act on the ground that it has the power to compel the actual execution of a will carrying out an agreement to make a bequest, or a devise, as this can be done only in the lifetime of, and by him, who makes such an agreement, and no breach can be assumed as long as he lives. The theory on which the court proceeds is to construe the agreement as binding the property of the testator or intestate so as to fasten or impress a trust on it in favor of the promisee." *Brickley* v. *Leonard*, 129 Me., 94, 98, and cases cited.

The facts in the instant case clearly bring it within the principles laid down in *Brickley* v. *Leonard*, supra, and the plaintiff's bill should be sustained, but without costs.

We hold that one-half of the several lots or parcels of land, with the buildings thereon, situated in the County of York and State of Maine, as bounded and described in paragraph 1 of plaintiff's bill, all formerly the property of John H. Chase, late of Waterboro in said county, deceased, and in addition thereto one-half of all goods

and chattels, rights and credits, and one-half of all personal property, as described in paragraph 3 of plaintiff's bill, all formerly the property of the said John H. Chase, the legal title to which said real estate is now in the defendants, Lura A. Chase, Estelle C. Chase and Minnie R. Bryer, and the legal title to said goods and chattels, rights and credits and personal property being in the defendants, Elias Smith and Henry Cleaves Sullivan, Administrators of the Estate of John H. Chase, deceased, in equity belong to, and the same hereby are charged with a trust as and from the date of the death of the said John H. Chase, to wit, August 11, 1929, in favor of and for the sole use and benefit of the plaintiff, the said Mabelle R. Lang, but all, by reason of the terms of the contract made and the existing equities, subject to a deduction of the amount necessary to pay one-half the costs and expenses of administration and all lawful claims and demands against said estate.

Inasmuch as the evidence in the case discloses no likelihood that resort to the real estate will be necessary for the payment of any part of the said costs and expenses, claims and demands, we hold that the defendants, the said Lura A. Chase, Estelle C. Chase and Minnie R. Byer, as trustees now holding in trust for the plaintiff for her sole use and benefit one-half of said hereinbefore described certain lots or parcels of land, with the buildings thereon, be ordered, within thirty days of the date of the decree to be rendered in this cause, to convey to the said plaintiff one-half in common and undivided of the said hereinbefore described lots or parcels of land by a good and sufficient quitclaim deed with covenants against the lawful claims and demands of all persons claiming by, through or under them, to be by them made, executed and acknowledged in due form and to be delivered to the said plaintiff.

From the record in the case, there would seem to be no question but that there is more than sufficient personal property to cover all claims and charges against the estate, and possibly one-half of the total amount of all classes of personal property disclosed by the inventory would be sufficient for that purpose, but, in our opinion, the agreement between the plaintiff and the deceased did not contemplate that she should have her half free from the payment of costs and expenses of administration and from the payment of claims and demands against the estate, but that she should have it

reduced by such payments. In any event, it can not be held that the plaintiff should have any greater rights than she would have had, had a will been made carrying out the provisions of the contract with the deceased. If there had been a will, the personal property in the first instance would have been liable for the payment of all said costs and expenses, claims and demands, and, if there had not been sufficient personal property for that purpose, resort to the real estate would have been necessary. This court, acting in equity, must do equity to the rights of others and we accordingly hold that the said defendants, Elias Smith and Henry Cleaves Sullivan, Administrators and defendants in this cause, as trustees now holding in trust for the plaintiff for her sole use and benefit one-half of the goods and chattels, rights and credits and personal property as described in paragraph 3 of plaintiff's bill, be ordered as said administrators and trustees to transfer and pay over to the said plaintiff for her sole use and benefit an amount of money equivalent to one-half of the net proceeds of all said goods and chattels, rights and credits and other personal property aforesaid, as soon as possible after final account shall have been rendered and allowed in said estate and costs and expenses of administration and all claims and demands against said estate shall have been paid.

The case being before us for complete disposition on report, for the purpose of carrying out the above holding we further hold that it is for the advantage of the estate itself, as well as in the interest of the plaintiff, that the said administrators as such trustees and in their capacity as administrators should convert said goods and chattels, rights and credits and other personal property into cash and pay over to the plaintiff the net one-half belonging to her as above.

*Bill sustained.*
*Decree in accordance*
*with this opinion.*